## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## BOWLING GREEN DIVISION

**CIVIL ACTION NO.: 1:08CV-150-M**

**AUS-TEX EXPLORATION, INC. and**
**DMS PARTNERS, LP**                                                                **PLAINTIFFS**

**v.**

**RESOURCE ENERGY TECHNOLOGIES, LLC**                                                **DEFENDANT**

### MEMORANDUM OPINION AND ORDER

This matter is before the Court upon a motion by the plaintiffs, Aus-Tex Exploration, Inc. and DMS Partners, LP, for a preliminary injunction [DN 3]. In their motion, the plaintiffs request an injunction that would require the defendant to either conduct an audit of various accounts as allegedly required by a contract between the parties, or to conduct an equitable accounting of the same accounts. A hearing on the plaintiffs' motion was held on November 19, 2008 where the Court heard evidence as to the contractual and business relationship between the parties and others. Upon request of the Court, the parties submitted post-hearing briefs as to these issues [DN 27, 32]. Having been fully briefed, the matter now stands submitted.

### I. BACKGROUND

DMS Partners, LP ("DMS"), a plaintiff in this lawsuit, was formed for the purpose of exploring oil and gas investment opportunities throughout the world. (Prelim. Inj. Hr'g Tr. [hereinafter "PIH"] 46:3-11, Nov. 19, 2008.) To obtain funding for various business prospects in Australia, David Schutte, DMS's principal, formed a public Australian company, Austin Exploration, Ltd. ("Austin Exploration") (Id. 46:16-19.) Austin Exploration began publicly trading on the Australian Stock Exchange approximately two years ago. (Id. 46:20-21.) Aus-Tex

Exploration, Inc. ("Aus-Tex"), also a plaintiff in this lawsuit, is a wholly-owned subsidiary of Austin Exploration that primarily runs its parent company's U.S.-based operations. (Id. 46:24-47:4.) Resource Energy Technologies, LLC ("RET") is a Kentucky limited liability company that has two members, John Charles and Robert Thorpe. (Id. 77:21-23.) RET obtains leases from various landowners in an area of Edmonson County, Kentucky known as the Park City Gas Field and drills wells "looking for gas coming out of the Fort Payne Formation." (Id. 81:16-20.) John Charles testified that RET does not solicit investors, but that five investors heard of RET and asked to invest in the wells. (Id. 82:23-83:7; 81:21-82:14.) This action arises out of a contract dispute with one of those investors, DMS. Aus-Tex is a party to this lawsuit because the plaintiffs maintain that DMS validly transferred all of its interest in these oil and gas wells to Aus-Tex. (Id. 61:25-62:10.)

The relationship between RET and DMS commenced in or around November 2007 when a well, Wilkerson 2A, was drilled under the terms of a letter agreement. (Id. 48:16-23.) DMS was to pay $80,000 for the two wells drilled under this letter agreement until the Participation Agreement was executed on February 12, 2008. (Id. 88:9-14.) Under the Participation Agreement, RET was to act as operator of the gas producing interests, and DMS, as non-operator of the interests. (Participation Agreement at 1-2.) In entering into the agreement, the parties anticipated that over 200 prospect wells would be identified and completed over five phases. (PIH 56:7-9.) For each prospect well identified by RET, DMS was to pay $150,000 to RET in exchange for a 75% working interest and a 65.625% net revenue interest in each particular well. (Participation Agreement at 2-3.) The plaintiffs maintain that they have deposited approximately $2.4 million ("Deposited Funds") with RET for purposes of drilling 17 prospect wells identified thus far. (PIH 56:9.) There is no dispute that most, if not all, of these wells were drilled without a written Operating Agreement,

which was not signed until June 10, 2008. (Id. 67:11-68:8.) However, the plaintiffs maintain that the parties had reached an agreement as to RET's duties when the participation agreement was signed, but that the format of the agreement was not formalized until June 2008. (Id.) The Participation Agreement defined "Operating Agreement" as the document attached to the Participation Agreement as "Exhibit B." (Participation Agreement at 2.) Attached to the Operating Agreement as "Exhibit B2" is a document entitled "Accounting Procedure" which appears to define the rights and duties of the parties in relation to the handling of funds located in a "Joint Account." (Accounting Procedure at 1.) The plaintiffs argue that the terms of these document provide the remedy they seek.

Specifically, the plaintiffs assert that under the Operating Agreement, RET is to hold the Deposited Funds in a separate "Joint Account" and is to hold those funds in a fiduciary capacity. (PIH 10:15-22, 13:10-17.) In connection with this duty, the plaintiffs argue that RET is required to account for the Deposited Funds by providing an audit upon plaintiffs' written notice. (Id.) The plaintiffs contend, however, that RET has not provided the aforementioned audit. (Id. 64:11-14.) The plaintiffs also argue that they have been and will continue to be irreparably harmed without this information and, therefore, request that the Court "compel RET to submit to an audit as a matter of equity and as a matter of contract interpretation." (Id. 5:21-24.)

## II. DISCUSSION

The Court begins its analysis by noting that it is only making a determination as to whether the plaintiffs have satisfied their burden for obtaining a preliminary injunction. In doing so, the Court makes no evaluation as to the persuasiveness of evidence that the parties may later set forth in other motions submitted to the Court or at trial. A preliminary injunction is an extraordinary

remedy that is used to preserve the status quo between the parties pending a final determination of the merits of the action. In determining whether to issue a preliminary injunction, the Court must consider four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction." Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp., 511 F.3d 535, 542 (6th Cir. 2007) (quoting Tumblebus Inc. v. Cranmer, 399 F.3d 754, 760 (6th Cir. 2005)). Generally, the "district court [is] to make specific findings concerning each of these four factors, unless fewer are dispositive of the issue." In re DeLorean Motor Co., 755 F.2d 1223, 1228 (6th Cir. 1985) (citing United States v. Sch. Dist. of Ferndale, 577 F.2d 1339, 1352 (6th Cir. 1978)).

The Court must first consider whether the plaintiffs have "demonstrated a strong likelihood of success on the merits." Tenke, 511 F.3d at 543. To satisfy this burden, the plaintiffs must raise "questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." Id. (quotation omitted). This requires the plaintiffs to show "more than a mere possibility of success." Id. (quotation omitted). Here the plaintiffs argue that, with regard to the Deposited Funds, they are entitled to a preliminary injunction because they are likely to succeed on their claim for a contractual audit, or, alternatively, for an equitable accounting of those funds. (Post Hr'g Br. Supp. Pls.' Mot. Prelim. Inj. [hereinafter "Pls.' Br."] at 2-11.)

### A. Contractual Audit

The plaintiffs assert that their right to a contractual audit of the Deposited Funds arises under

4

the Accounting Procedure. Under that document, the plaintiffs contend that RET is to establish a separate Joint Account that is to hold all funds related to the plaintiffs' interest in the oil and gas wells, including the Deposited Funds. It is undisputed that on September 12, 2008, the plaintiffs requested, but were not provided with an audit of the Deposited Funds. RET contends that it did not provide the requested audit because there was no contractual duty requiring them to provide an audit. (Def.s' Post Hr'g Mem. Opp'n Pls.' Mot. Prelim. Inj. [hereinafter "Def.'s Br."] at 12-13.)

Whether RET is required to provide an audit to the plaintiffs is governed by the contract. The interpretation of a contract is a question of law for the Court to decide. Equitania Ins. Co. v. Slone & Garrett, P.S.C., 191 S .W.3d 552, 556 (Ky. 2006). "In construing a contract, a court's primary objective is to ascertain and to effectuate the intention of the parties to the contract from the contract itself." Logan Fabricom, Inc. v. AOP P'ship, LLP, No. 2004-CA-002410-MR, 2006 WL 3759412, at *2 (Ky. Ct. App. Dec. 22, 2006) (citations omitted). "[I]n the absence of ambiguity, a written instrument will be enforced strictly according to its terms, and a court will interpret a contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence. Frear v. P.T.A. Indus., Inc., 103 S.W.3d 99, 106 (Ky. 2003) (quotation and citation omitted). However, "[i]t is generally recognized that if a contract is silent on a certain point, the law will imply an obligation to carry out the purpose for which the contract was made . . . . Terms are implied in a contract to give the contract the effect the parties would have agreed on if they would have considered the possibility of subsequent events." Old Republic Ins. Co. v. Ashley, 722 S.W.2d 55, 58 (Ky. Ct. App.1986) (citations omitted). See also Ranier v. Mount Sterling Nat'l Bank, 812 S.W.2d 154, 156 (Ky. 1991) ("[W]hen a contract is silent with respect to a matter vital to the rights of the parties, a court, in construing it, is necessarily compelled to resort to a consideration of the

surrounding circumstances and the conduct of the participants indicating their interpretations.") (quotation omitted); Richardson v. Eastland, Inc., 660 S.W.2d 7, 8 (Ky. 1983) ("Where the contract is silent we must interpret the intent of the parties."); Bank of N.Y. v. Janowick, 470 F.3d 264, 271-272 (6th Cir. 2006) (same).

The plaintiffs are not likely to succeed on their claim for a contractual audit of the Deposited Funds because the plain language of the contract in question does not impose a duty on RET to provide such an audit. In support of their position, the plaintiffs rely upon section 5 of the Accounting Procedure. That section provides that "[a] Non-Operator, on notice in writing to the Operator and all other Non-Operators, shall have the right to audit the Operator's accounts and records relating to the Joint Account for any calendar year within the twelve-month (12) month (sic) period following the end of a calendar year . . . ." (Accounting Procedure at 3.) Therefore, only if the Deposited Funds are part of the Joint Account would the plaintiffs be entitled to an audit of those funds. The Accounting Procedure defines "Joint Account" as "the operations bookkeeping account stating offsets (netting), showing the revenues, billings, charges paid and credits in the conduct of the Joint Operations and which are shared by the Parties, after well completion." (Id. at 1.) Joint Operations are defined as "all operations necessary or proper for the development, operation, protection, and maintenance of the Joint Property, after shut-in or well Completion. All operations conducted pursuant to this Agreement and the Participation Agreement which are on a Turnkey basis, are *excluded from Joint Operations and the Joint Account*." (Id. (emphasis added).)

Here, there is no dispute that the wells in question were to be drilled on a turnkey basis. Section V(D)(1) specifically provides that "[a]ll wells drilled on the Contract Area shall be drilled on a Turnkey basis as set forth in the Participation Agreement." (Operating Agreement at 11.)

Although not defined in the contract, the parties generally agree that a turnkey well is a well in which an investor contributes a fixed amount of money in exchange for the drilling and completing of a well. (See Pls.' Br. at 3 n.1; PIH 100:21-101:7.) Therefore, when a well is drilled on a turnkey basis, it is the operator who incurs the added cost of drilling and completing the well if the cost to do so should exceed the fixed amount of money paid by the investor. The term "completion" is defined in the Participation Agreement as "only those results or processes specifically set forth herein, namely, a four-point test, an electronic log of the well-bore, acidizing (stimulating) only the Ft. Payne formation; stimulating and fracturing other formations is not included." (Participation Agreement at 1.) The Participation Agreement also provides that "[a]fter each well has reached Objective Depth, Operator [RET], in its sole discretion, shall make such attempts to complete each Well, as would be made by a reasonable and prudent Operator, pursuant to practices prevailing in the area and for the Objective Depth." (Id. at 2.) To date, only four of seventeen wells that were drilled on behalf of the plaintiffs have been completed.

Notwithstanding the plaintiffs arguments to the contrary, the Deposited Funds are not part of the Joint Account because the Deposited Funds represent "operations conducted . . . on a Turnkey basis . . . ." By the plain terms of the Participation Agreement, the $150,000 that the plaintiffs invested per well represented their share of the "Turnkey Drilling and Completion Costs" which is defined as their "share of the cost to drill . . . and to Complete the well . . . ." (Participation Agreement at 2.) None of the Deposited Funds were to be used for operations that occurred after a particular well was completed; nor were any of the Deposited Funds to be shared by the parties. The Deposited Funds simply are not part of the Joint Account and RET therefore in not required to provide an audit of those funds.

7

The plaintiffs contend that the term "turnkey" is ambiguous because RET, through its course of performing the contract, has not treated the Deposited Funds as turnkey payments. Specifically, the plaintiffs reference various RET invoices requesting payment from the plaintiffs for certain expenses required to complete the wells. The plaintiffs argue that if the Deposited Funds were truly turnkey payments, then there would be no need for RET to request any further deposits until after the wells in question were completed. However, at this point in the proceedings, there is insufficient evidence in the record for the Court to doubt what the contract plainly says: that "[a]ll wells drilled on the Contract Area shall be drilled on a Turnkey basis . . . ," and that the Joint Account only holds funds that are to be shared by the parties "after well completion." If the plaintiffs believe that they were improperly invoiced for various costs to complete "turnkey" wells, then they can continue to pursue their claim for breach of contract.

### B. Equitable Accounting

The plaintiffs alternatively argue that, even if the Account Procedure does not govern the rights and duties of the parties with regard to the Deposited Funds, they are still entitled to an equitable accounting of those funds. In support of this position, the plaintiffs cite to section V(D)(3) of the Operating Agreement which provides

> Operator shall hold for the account of the Non-Operators any funds of the Non-Operators advanced or paid to the Operator, either for the conduct of operations under this Agreement or as a result of the sale of production from the Contract Area, and those funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Non-Operators or applied toward the payment of debts, transportation and processing fees, operating expenses, and all other charges related to marketing production from the Parties interests. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators for any purpose other than to account for Non-Operator funds received, as specifically provided. Operator shall establish, and at all times maintain, a separate account for all funds relating to the interest of DMS, including without limitation, the receipt,

transfer, and expenditure of funds relating to DMS' interest.

(Operating Agreement at 11.) The plaintiffs would have the Court interpret this provision of the contract as requiring RET to hold in a fiduciary capacity all funds received from the plaintiffs including the Deposited Funds. They argue that the phrase "conduct of operations" is ambiguous and that it should be construed against RET so as to incorporate within its definition those "operations" that occurred before well completion. Furthermore, the plaintiffs point out that, unlike the Accounting Procedure, there is no provision which limits the application of this section merely to non-turnkey operations.

The Court disagrees. Even though this provision does not explicitly distinguish between turnkey and non-turnkey operations, it does provide that RET only has a duty to account for those funds that are advanced or paid "*either for the conduct of operations under this Agreement or as a result of the sale of production* from the Contract Area . . . ." (Id. (emphasis added).) John Charles testified that in the oil and gas industry, the phrase "conduct of operations" refers only to the production phase of drilling. Specifically, John Charles testified that "[t]he whole term operations in the oil and gas accounting, everything referring to operations is the production phase. You have the drill phase, the completing phase, and the operations phase. All of the accounting – your charter accounts is all set up on that basis." (PIH 127:21-128:1.) The plaintiffs do not dispute that this is the industry standard definition of that term. Instead, they argue that the Court should not interpret the phrase "conduct of operations" according to its industry standard definition. (Pls.' Br. at 9.) Under Kentucky law, however, when words "are used as technical terms in a transaction entered into by parties knowledgable in a technical field then the technical meanings of such words are the meanings to be ascribed to those words." Cook United, Inc. v. Waits, 512 S.W.2d 493, 495 (Ky.

9

1974) (citing Bradford v. Billington, 299 S.W.2d 601 (Ky. 1957)). Furthermore, in interpreting a contract, the Court does not look at a particular provision in a vacuum; rather "[a] writing is interpreted as a whole and all writings that are part of the same transaction are interpreted together." Id. The Court does not find the phrase "conduct of operations" to be ambiguous. When this contract is viewed as a whole, the $150,000 paid by the plaintiffs per well, as discussed above, was a fixed fee paid for the purposes of drilling and completing each well. The Deposited Funds were not for the "conduct of operations." The Court is of the opinion that the plaintiffs are not likely to succeed on their claim for an equitable accounting because section V(D)(3) does not require RET to hold the Deposited Funds in a fiduciary capacity and therefore RET has no equitable duty to account for those funds.[1]

The plaintiffs' failure to meet their burden on this factor is dispositive. Even if the Court were to find in favor of the plaintiffs on the remaining factors, such findings would not overcome the plaintiffs failure to show a strong likelihood of success on the merits. See Gonzales v. Nat'l Bd of Med. Exam'rs, 225 F.3d 620, 625, 632 (6th Cir. 2000) (finding it unnecessary to analyze the other factors because "a finding that there is simply no likelihood of success on the merits is usually fatal.") (citing Mich. State AFL-CIO v. Miller, 103 F.3d 1240, 1249 (6th Cir. 1997)).

---

[1] RET argues that the terms of the Operating Agreement and Accounting Procedure do not apply to wells drilled before those documents were executed on June 10, 2008. (Def.'s Br. at 15-16.) However, at this stage of the litigation, the Court need not determine whether RET was bound by the terms of the Operating Agreement and Accounting Procedure for wells drilled before those documents were executed because, even under the terms of those documents, the plaintiffs are not likely to succeed on the merits.

## III.  CONCLUSION

The Court finds that the preliminary injunction requested by the plaintiffs is not warranted. Accordingly, **IT IS HEREBY ORDERED** that the plaintiffs' motion for a preliminary injunction [DN 3] is **DENIED**.

cc:     Counsel of Record